## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

**DR. S.C. and MS. S.C.,** on behalf of themselves and their minor child **S.C.,**

*Plaintiffs,*

-*against*-

**CITY OF NEW YORK; NEW YORK CITY ADMINISTRATION FOR CHILDREN'S SERVICES; V. BYERS,** in his individual and official capacities**; MICHAEL SHANNON,** in his individual and official capacities**; MARY ADEMOLA, LMSW,** in her individual and official capacities**; AMANDA KING, LMSW,** in her individual and official capacities**; and JOHN/JANE DOES 3–10, i**n their individual and official capacities**.**

*Defendants.*

Case No.: _____

COMPLAINT

JURY TRIAL DEMANDED

---

## INTRODUCTION

This case centers on a flagrant violation of one of our most sacred constitutional protections—the right to be free from warrantless government searches of one's body—committed against a three-year-old child hours after he lost his infant brother. On March 27, 2025, without parental consent, without court authorization, and without any emergency circumstances, New York City

Administration for Children's Services (ACS) officials ordered and conducted a strip search of Plaintiffs' grieving three-year-old son. The child's mother heard the supervisor explicitly instruct the caseworker to "search his body," yet at no point were the parents informed of this intention or given the opportunity to object. The strip search—conducted through deception while the father was comforting his son—violated not only clearly established Fourth Amendment protections but basic human dignity.

The Supreme Court and Second Circuit have long recognized that strip searches represent one of the most extreme intrusions into personal privacy. Yet ACS conducted this search without the slightest attempt to comply with constitutional requirements. No court order was sought. No parental consent was requested. No emergency circumstances existed. The search had no legitimate child-protective purpose, as the surviving child showed no signs of abuse or neglect, and the child was in his father's direct care and supervision. The unjustified nature of this search would be further confirmed the very next day when the Medical Examiner determined there was "no indication of maltreatment" regarding the infant's death, and later when ACS itself admitted there was "no concern about abuse or neglect."

This unconstitutional strip search marked only the beginning of a calculated campaign of harassment that intensified when Plaintiffs dared to question ACS's actions. Following the initial violation, ACS personnel subjected the family to midnight text messages, calls from multiple phone numbers, unannounced visits that continued even after the family returned to their

permanent residence in Puerto Rico, and coercive efforts to force the grieving parents into separate mandatory "Child Safety Conferences"—with Ms. King explicitly insisting on holding distinct conferences for each parent, a tactic that purposefully divided the grieving family rather than supporting them as a unit. Most disturbing of all, these conferences were purportedly to "identify the best safety plan" for an infant who was already deceased—a surreal administrative pursuit that persisted even while ACS explicitly acknowledged there were no safety concerns whatsoever regarding the surviving child.

At every stage, Defendants treated this family—a board-certified child psychiatrist and psychiatric nurse practitioner with spotless records—not as victims of an unimaginable tragedy but as targets for suspicion, surveillance, and control. Their actions reflect not just individual misconduct but institutional customs of disregarding constitutional search protections and retaliating against families who assert their rights.

This complaint seeks accountability for the unconstitutional strip search and subsequent harassment that have left lasting trauma. The Plaintiffs' surviving child now suffers nightmares about "people coming to take him away" and experiences panic during routine medical check-ups, a direct result of the warrantless search of his body during acute grief. These constitutional violations were not just foreseeable—they were deliberate choices made by government officials who knew better, who were repeatedly informed of their legal obligations, and who intensified rather than remedied their misconduct when confronted.

**SECTION 1983 CIVIL RIGHTS COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs, by and through counsel, allege as follows:

**NATURE OF ACTION**

1. This is a civil-rights action challenging the New York City Administration for Children's Services' ("ACS") unconstitutional and retaliatory conduct against a grieving family in the immediate aftermath of infant death. Despite statutorily-required "trauma-informed" protocols, ACS (1) conducted a warrantless and nonconsensual strip search of Plaintiffs' three-year-old son; (2) repeatedly harassed Plaintiffs with uninvited home visits and late-night phone calls even after officially finding "no concern about abuse or neglect"; and (3) retaliated against Plaintiffs for raising concerns about this misconduct.

2. Defendants' conduct violated Plaintiffs' clearly established constitutional rights under the Fourth Amendment (unreasonable search and seizure), Fourteenth Amendment (substantive and procedural due process), and First Amendment (speech-based

retaliation). Plaintiffs seek compensatory and punitive damages, declaratory relief, and prospective injunctive relief to prevent similar harm to other bereaved families.

## JURISDICTION AND VENUE

3.  This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367. Plaintiffs' claims arise under 42 U.S.C. § 1983 and the U.S. Constitution.

4.  Venue lies in the Southern District of New York because a substantial part of the events giving rise to this action occurred in Manhattan.

## PARTIES

5.  Plaintiffs Dr. S.C. and Ms. S.C. are married and the biological parents of minor S.C. (age 3) and infant M.C. (deceased). Dr. S.C. is a board-certified child psychiatrist and Ms. S.C. is a registered nurse and board-certified psychiatric mental health nurse practitioner. Their primary residence is in San Juan, Puerto Rico, where both children were born and where they maintain deep community ties, extended family connections, and established healthcare and educational support systems for their three-year-old son.

6.  Defendant City of New York is a municipal corporation that, through its agency ACS, is responsible for child welfare investigations in the five boroughs.

7.   Defendant Administration for Children's Services is New York City's child welfare agency, legally obligated under state law to use trauma-informed approaches and to balance family privacy with child protection.

8.   Defendant "V. Byers" is an ACS Supervisor who instructed Defendant Shannon to conduct the unauthorized strip search. He is sued in his individual and official capacities.

9.   Defendant Michael Shannon is an ACS Caseworker who conducted the nonconsensual and warrantless strip search of the Plaintiffs' child. He is sued in his individual and official capacities.

10.   Defendant Mary Ademola, LMSW is an ACS Director who made false representations about agency communications after Plaintiffs raised concerns about the strip search. She is sued in her individual and official capacities.

11.   Defendant Amanda King, LMSW is an ACS Child-Safety Conference Coordinator who continued to harass Plaintiffs with calls and texts even after ACS acknowledged a lack of any risk factors. She is sued in her individual and official capacities.

12.   Defendants John and Jane Does 3–10 are yet-unidentified ACS staff members who participated in the constitutional violations alleged herein. They are sued in their individual and official capacities.

## ADMINISTRATIVE PREREQUISITES

13.    On April 2, 2025, Plaintiffs timely filed a Notice of Claim (Ex. D) with the New York

City Comptroller pursuant to General Municipal Law § 50-e. More than thirty days have

elapsed since filing, and the claim has not been adjusted or settled.

14.    Plaintiffs have satisfied all conditions precedent to bringing this action.

## STATEMENT OF FACTS

15.    **Family Background.** Dr. S.C. and Ms. S.C. are married healthcare professionals with

advanced training in pediatrics and psychiatry. Their older child, S.C., is three years old,

and their infant son M.C. was three months old at the time of his passing. The family's

primary residence is in Puerto Rico, where both children were born and where they

maintain deep community ties, extended family connections, and established healthcare

and educational support systems for their three-year-old son. They were temporarily

staying in lower Manhattan for their first family vacation with their new baby when their

infant son unexpectedly passed away.

16.    **Infant's Death (March 27, 2025).** On the morning of March 27, 2025, the family

discovered that M.C. had tragically died overnight. Following immediate notification of

emergency services, the New York Police Department and Medical Examiner's office

initiated standard protocols for cases of unexplained infant death.

17. **Initial ACS Visit (March 27, 2025).** Later that same day, at approximately 10:00 p.m., ACS personnel—including Defendants Byers and Shannon—arrived at Plaintiffs' temporary Manhattan residence. They explained that a report had been made to the State Central Registry, automatically triggered by the infant's death.

18. **Supervisor's Strip-Search Instruction.** During this visit, the surviving child (age 3) was upstairs with his father, Dr. S.C., who was attempting to comfort him. Without informing Plaintiffs of their intentions, Defendant Byers explicitly instructed Defendant Shannon— within audible range of Ms. S.C.—to "search [the child's] body." At no point did any ACS representative request permission for a physical inspection or notify Plaintiffs that such an examination would occur.

19. **Unauthorized Strip Search.** Without consent, judicial authorization, or exigent circumstances, Defendant Shannon proceeded to conduct a strip search of the three-year-old child, examining his body for signs of abuse. The search was conducted despite the absence of:

   • Any observations suggesting physical abuse

   • Any prior child welfare history for the family

   • Any statements by the child indicating maltreatment

- Any emergency circumstances that would preclude normal consent or court order protocols

20. **Post-Search Findings.** After completing their investigation, including both the unauthorized search and interviews with the parents, ACS identified no concerns regarding the care of the surviving child. As Defendant Ademola would later inform Plaintiffs on April 1, 2025, "from… on… our end [ACS] there is no concern about abuse or neglect."

21. **12:16 a.m. Text Message.** Despite knowing the family was in acute grief, at 12:16 a.m. on March 28, 2025—just hours after the initial visit—ACS personnel sent Ms. S.C. a text message requesting a second visit that same night for "a brief meeting," even though ACS had spent nearly three hours with the family earlier that evening (See Ex. A).

22. **Extended Second Visit (March 28, 2025).** The following day, ACS conducted another lengthy visit—lasting several hours—while Plaintiffs were actively attempting to make funeral arrangements for their deceased child. During this visit, ACS personnel again identified no safety concerns.

23. **Medical Examiner's Preliminary Findings (March 28, 2025).** Medical Examiner Dr. Bahadir Yildiz informed Plaintiffs that he found no evidence on autopsy of injury and had already informed colleagues that he found no indication of maltreatment in

connection with the death. Dr. Yildiz further stated that SIDS (Sudden Infant Death Syndrome) was "very high" on his "differential diagnosis."

24. **Formal Letter to ACS (March 31, 2025).** On March 31, 2025, Plaintiffs sent a formal letter to Defendant Oren, the Manhattan Borough Director of ACS. The letter raised multiple concerns about ACS's conduct, including the lack of trauma-informed practice, the inappropriate questioning of their grieving child, and the 12:16 a.m. text message. The letter requested documentation of the investigation, clarification of policies, and more appropriate protocols for any future communications.

25. **Official "No Concerns" Determination (April 1, 2025).** On April 1, 2025, Defendant Ademola called Dr. S.C. and explicitly stated that "from… on… our end [ACS] there is no concern about abuse or neglect." (Ex. C). She confirmed that she had spoken with both the assigned caseworker and supervisor. Despite this express finding of no safety concerns, Ademola indicated ACS would continue to conduct additional home visits and interventions.

26. **Filing of Notice of Claim and Formal ACS Complaint (April 2, 2025).** Plaintiffs filed a detailed Notice of Claim (Ex. D) with the NYC Comptroller and submitted a formal complaint to the ACS Commissioner and Department of Investigation Commissioner, documenting the strip search and subsequent misconduct.

27. **Post-Determination Harassment.** After determining there were "no concerns" and after receiving Plaintiffs' formal complaint, ACS personnel increased rather than decreased their intrusions, including:

• Calls from multiple different phone numbers

• Multiple unannounced visits to Plaintiffs' temporary Manhattan residence, some occurring even after Plaintiffs had returned to Puerto Rico

• Multiple calls when Plaintiffs were arranging funeral services

• Calls to both parents' phones separately rather than coordinated communications as requested

• Phone contact attempts continuing as recently as April 22, 2025—almost one month after the initial investigation found "no concerns" and weeks after Plaintiffs engaged legal counsel

28. **Aftermath and Continuing Harm.** As a direct result of this conduct, Plaintiffs' surviving child now exhibits symptoms of trauma, including nightmares about "people coming to take him away." The child becomes visibly distressed when unknown adults approach him and has developed anxiety about routine medical care, likely stemming from the warrantless examination of his body during acute grief. The family had intended to return to Puerto Rico immediately following the tragic loss of their infant, where their surviving son could resume his normal routine at his preschool and access his established

support network of extended family and familiar healthcare providers. However, ACS's persistent demands for availability in New York City significantly disrupted these plans, exacerbating the child's distress and delaying his access to these critical support systems during a time of profound grief.

29. **Phone Campaign and Persistent Harassment by CSC Coordinator Amanda King.**

On April 10, 2025, despite Dr. S.C.'s detailed and respectful attempts to engage substantively with CSC Coordinator Amanda King—beginning with two phone calls that morning—she did not answer, but responded by text: "Good morning. I am on the train. I will call back when I get off." After Dr. S.C. followed up with substantive messages referencing ACS policies, raising UCCJEA jurisdictional concerns, requesting electronic copies of unprovided pamphlets, and addressing the unauthorized search of their child, King never returned his call. Instead, she shifted her focus to Ms. S.C., continuing to call and text her directly through at least April 22, 2025 (Ex. E), despite being expressly informed that both parents were represented by legal counsel. King also falsely insisted: "I handed a brochure to each of you," a claim directly contradicted by contemporaneous video review showing that Dr. S.C., who was holding their child in one hand and a notepad in the other, received no such materials. Her refusal to engage with the parent who had proactively sought to resolve the matter, and her continued outreach to both

legally represented parents, reflects a deliberate disregard for legal boundaries and professional norms.

30. **Guerrilla-Style Tactics.** As Dr. S.C. explicitly described in an unanswered text message to King on April 10, 2025 (Ex. E): "Repeated unannounced visits to the location where we were temporarily staying, which continued even after we had left, along with calls from downstairs without notice and contact via unlisted or burner phones to my personal cell, reflect a pattern of guerrilla-style engagement. These actions, coupled with misrepresentations of fact—such as falsely claiming that materials were provided—create disruption, violate boundaries, and erode trust. This conduct is fundamentally inconsistent with principles of transparency, procedural fairness, and trauma-informed practice expected of ACS." This text accurately summarizes the pattern of conduct that persisted throughout ACS's involvement with the family.

31. **Surreal Administrative Pursuit.** ACS, through Ms. Ademola, had explicitly confirmed there were "no safety concerns" regarding the surviving child, and Ms. King herself stated by phone that the planned Child Safety Conferences would focus on the deceased infant. Notably, ACS's own website describes these conferences as being intended "to identify the best safety plan for the child." Yet in this case, the child whose safety was supposedly at issue was no longer alive. The idea of convening mandatory conferences to "protect" an infant who was no longer alive—while simultaneously ignoring the scared

living child who was held by Dr. S.C. in front of her eyes —was not simply misguided. It

was surreal. Ms. King's continued pursuit of these proceedings, in the face of this reality,

reflects an administrative process so utterly detached from logic or reason that it read less

like social work and more like dark theater. Rather than offering closure or support,

ACS's actions extended the family's grief through a performance of child protection for a

child who had passed beyond existence itself, yet whose death Ms. King continued to

process as merely an administrative inconvenience.

32.    **Deliberate Family Separation Strategy.** In addition to the unauthorized physical search,

Defendants employed a deliberate strategy of separating the family during their acute

grief. Shannon and Byers demanded that Plaintiffs be interrogated separately on March

27-28, 2025. Later, King explicitly insisted on holding separate Child Safety Conferences

for each parent, stating in her April 10 text message: "The conference will be separate for

each of you." This approach runs contrary to trauma-informed practices, which

emphasize supporting family unity during bereavement. Rather than allowing the family

to process their grief together, ACS's practices encouraged family separation and

heightened distress during a period of intense vulnerability.

33.    **Deliberate Indifference to Trauma.** ACS's own policy manual highlights the need for

trauma-informed practice with bereaved families. Yet Defendants ignored Plaintiffs'

explicit pleas that the child was exhibiting signs of acute distress and that further surprise

contacts would exacerbate harm. King's LinkedIn profile claimed "expertise in trauma-focused interventions" and "person-centered therapeutic care," yet her documented conduct—including midnight texts, uninformed questioning of a grieving three-year-old, and persistent division of the family unit—demonstrated profound disregard for established trauma-informed practices. ACS's persistence—despite its own "no concerns" finding—constitutes deliberate indifference to the obvious risk of renewed trauma.

34. **Documented Professional Incompetence by ACS Personnel.** In a follow-up email to Ms. Oren on March 31, 2025, Dr. S.C. documented a specific example of the caseworkers' concerning lack of pediatric knowledge: during the home visit, the supervisor saw Plaintiffs' three-year-old Sebastian's high chair and "expressed approval that this was where M.C. (three months old) would sit for feeding." As Dr. S.C. noted, "This concerned us as it showed unfamiliarity with basic developmental milestones, as three-month-old infants cannot sit unassisted and are not developmentally ready for high chairs." This incident, alongside other documented instances of professional incompetence, demonstrates that ACS personnel lacked the basic pediatric developmental knowledge necessary to conduct appropriate assessments of child safety and well-being, yet continued to intrude upon the family's privacy and autonomy.

35. **ACS Misrepresentation and Internal Confusion.** On April 1, 2025, Dr. S.C. spoke for approximately 45 minutes by telephone with an ACS representative who deliberately

misidentified herself as "Marianne Adamaola," even after Dr. S.C. asked her three

separate times to spell out her name clearly. Only later, through independent payroll

record searches, did Dr. S.C. confirm her true identity as Mary O. Ademola, Director of

Field Operations at ACS, with an annual salary listed as approximately $141,839. During

this call, Ms. Ademola claimed she was following up on a conversation between Dr. S.C.

and Ms. Oren—a conversation that never occurred, as Ms. Oren had never called Dr. S.C.

Ms. Oren's sole communication with Plaintiffs was a brief email acknowledging receipt

of their letter and inquiring about their legal representation. Ms. Ademola's deliberate

misrepresentation of her identity, combined with referencing a nonexistent conversation,

indicates either intentional deceit or profound internal dysfunction within ACS, both

scenarios severely undermining the agency's credibility.

36. **Filing of Notice of Claim and Formal Complaint (April 2, 2025).** Taking formal legal

and administrative steps, Plaintiffs filed a detailed Notice of Claim with the NYC

Comptroller (Ex. D) and submitted a comprehensive formal complaint directly to ACS

Commissioner Jess Dannhauser and Department of Investigation Commissioner Jocelyn

Strauber. The formal complaint explicitly detailed the unconstitutional strip search,

describing it as "invasive, wholly unjustified, and constitut[ing] a clear violation of

established constitutional protections, statutory provisions, and relevant case law." The

complaint included citations to specific legal authorities including *Tenenbaum v.*

Williams, explained the absence of exigent circumstances, and sought specific remedial action.

37. **Post-Claim Retaliatory Intensification.** Despite receiving formal notice of the constitutional violations through both the Notice of Claim (Ex. D) and a formal complaint directed to the Commissioner's office, ACS not only continued but intensified its harassment campaign. ACS's actions following these filings—including continued calls from multiple phone numbers, repeated attempts to schedule separate Child Safety Conferences for each parent, and persistent demands for engagement despite having already determined there were "no concerns of abuse or neglect"—demonstrate that these contacts were not legitimate child protection activities but rather retaliatory conduct designed to punish Plaintiffs for asserting their rights.

38. **Demands for Clarification Ignored.** Plaintiffs' March 31, 2025 letter to ACS (Exhibit B) reasonably requested specific information about policies and protocols governing the investigation, explicitly sought trauma-informed approaches, and requested that communications occur during reasonable hours with sufficient notice. Rather than addressing these reasonable requests, ACS personnel intensified their harassment, continuing with unannounced visits, late-night communications, and myriad phone calls, demonstrating complete disregard for the family's well-documented grief and the trauma experienced by the three-year-old child.

39. **Professional Credentials Disregarded.** Despite Plaintiffs' professional qualifications—Dr. S.C. as a board-certified child psychiatrist and Ms. S.C. as a registered nurse and board-certified psychiatric mental health nurse practitioner—ACS persisted in questioning their parenting abilities and demanding continued access to their child long after determining there were "no concerns." This demonstrates ACS's institutional pattern of disregarding parents' professional expertise and treating all families with suspicion regardless of evidence, education, or cooperation.

40. **Psychological and Emotional Damages.** As a direct result of Defendants' unconstitutional actions, Plaintiffs and their minor child have suffered significant psychological harm. Minor S.C. continues to exhibit clinically significant trauma-related symptoms—including nightmares, hyper-vigilance around strangers, and marked anxiety during routine medical examinations—necessitating weekly psychotherapy. Dr. S.C. has documented difficulty sleeping and concentrating, while Ms. S.C. describes ongoing dread that state actors may reappear unannounced. Each new ACS contact after March 27 re-activated the family's trauma response; thus every voicemail, text, and unannounced visit constitutes an indivisible part of the continuing violation and compounds Plaintiffs' compensatory damages.

41. **Medical Examiner Findings.** On March 28, 2025, Medical Examiner Dr. Bahadir Yildiz informed Plaintiffs that he "found no evidence of injury and had already informed

colleagues that he found no indication of maltreatment in connection with our infant's passing." Dr. Yildiz further stated that SIDS was "very high on his differential diagnosis." The lack of any medical evidence supporting suspicion of abuse or neglect further demonstrates that the strip search had no factual basis and was unwarranted under the circumstances. Despite having access to this crucial medical information, ACS continued its invasive practices.

**FIRST CAUSE OF ACTION:**

**FOURTH AMENDMENT VIOLATION**

(Unreasonable Search and Seizure)

41. **Unreasonable Search.** By conducting a warrantless and nonconsensual strip search of a minor child without parental consent or notification, a court order, or exigent circumstances, Defendants violated clearly established Fourth Amendment rights. Child protective searches require either consent, a warrant/court order, or true emergency circumstances. *Tenenbaum v.* Williams, 193 F.3d 581, 603-05 (2d Cir. 1999); see also *Southerland v.* City of New York, 680 F.3d 127, 161 (2d Cir. 2012).

42. **Absence of Exigent Circumstances.** No emergency justified bypassing traditional Fourth Amendment protections. The child was not in distress, showed no signs of injury,

made no statements suggesting abuse, and was in the direct care and supervision of his

father. ACS's own stated policies indicate they had "no concern about abuse or neglect."

43. The warrantless and nonconsensual examination of the child's body violated clearly

established Fourth Amendment rights that any reasonable child-protective worker would

have known. See, e.g., *Matter of Diane P.*, 110 A.D.2d 354 (2d Dep't 1985) (restricting

physical examinations).

44. Defendants had no court order, consent, or emergency circumstances that could justify

the search. Therefore, the strip search was unconstitutional.

## SECOND CAUSE OF ACTION:

## FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS

(Interference with Family Integrity)

45. Parents have a fundamental liberty interest in the care, custody, and control of their

children. See *Troxel v. Granville*, 530 U.S. 57 (2000).

46. Defendants violated Plaintiffs' substantive due process rights by:

    a.   Conducting the strip search without parental consent or notification

    b.   Misrepresenting the nature of their investigation to gain access

    c.     Continuing to demand access to the child even after finding "no concerns about abuse or neglect"

    d.     Purposefully employing a family separation strategy by conducting separate interviews and scheduling separate mandatory conferences

    e.     Using harassing contact methods calculated to disrupt grieving processes

    f.     Impeding the family's return to Puerto Rico, where their surviving child could access his established preschool, familiar medical providers, and extended family support network critical for processing grief

    g.     Demanding compliance with New York-based interventions despite knowing the family's primary residence and support systems were in Puerto Rico, effectively attempting to assert jurisdiction beyond appropriate boundaries

47. The invasions of parental rights were clearly arbitrary, conscience-shocking, and exceeded legitimate governmental authority in child welfare. See *Southerland*, 680 F.3d at 151-52 (discussing standard).

48. Defendants' conduct directed at a family during acute grief for a deceased infant "shocks the conscience" and constitutes deliberate indifference to Plaintiffs' clearly established familial rights.

**THIRD CAUSE OF ACTION:**

**FOURTEENTH AMENDMENT PROCEDURAL DUE PROCESS**

**(Deprivation Without Process)**

49. Defendants bypassed required procedural protections for child-protective searches, including opportunities to object, court orders, and informed consent protocols. See *Vega v. City of New York*, No. 21-CV-0364, 2021 WL 4077907 (S.D.N.Y. Sept. 7, 2021).

50. By conducting the search covertly, without notice or opportunity for the parents to object, ACS personnel violated procedural due process requirements firmly established in *Tenenbaum*.

51. Post-determination demands for continued access to the child without any articulated safety concerns similarly violated procedural due process by effectively compelling participation in interventions without any identifiable risk or basis.

**FOURTH CAUSE OF ACTION:**

**FIRST AMENDMENT RETALIATION**

**(Protected Speech)**

52. By raising concerns about ACS's conduct, both through the March 31, 2025 letter to ACS Borough Chief Oren and subsequent complaints, Plaintiffs engaged in speech protected by the First Amendment.

53. In response to this protected speech, Defendants retaliated through:

   a. Intensified unannounced visits with escalating demands

   b. Persistent demands for participation in "conferences" despite having determined there were "no concerns"

   c. Communications from different ACS personnel requiring separate responses

   d. Continuing harassment for at least two weeks after Plaintiffs obtained legal counsel, deliberately circumventing proper legal channels

   e. Insistence on separate conferences that would require each parent to secure separate legal representation, creating significant additional financial and logistical burdens during a period of grief

54. Plaintiffs engaged in protected speech by objecting to the search and other ACS misconduct through multiple formal channels, including a detailed letter to ACS leadership dated March 31, 2025 (Ex. B), a comprehensive formal complaint to ACS Commissioner Dannhauser on April 2, 2025, and filing of a Notice of Claim (Ex. D).

Defendants responded with adverse actions—multiple calls to both parents, surprise visits even after Plaintiffs had left New York, and documented misrepresentations—sufficient to deter a reasonable person from further speech. The close temporal proximity between Plaintiffs' protected activities and the intensification of harassment establishes causation, as does ACS's acknowledgment on April 1, 2025 that there were "no concerns of abuse or neglect" that could legitimize continued intervention.

55. **Intensification of Harassment Following Protected Activity.** After Plaintiffs sent their March 31 email citing concerns about ACS conduct and requesting clarification, ACS not only failed to address these reasonable concerns but intensified its intrusive tactics. The causal connection is established by: (1) the escalation pattern of increased calls and visits following each of Plaintiffs' formal communications; (2) ACS's use of deceptive practices (such as Ms. Ademola falsely claiming Ms. Oren had spoken with Dr. S.C. when she had not); and (3) continued pursuit of Plaintiffs even after ACS had explicitly determined there were "no concerns" regarding child safety—indicating the true purpose was harassment, not legitimate child protection.

**FIFTH CAUSE OF ACTION**

**MONELL LIABILITY**

(Municipal Liability for Unconstitutional Customs and Practices)

56. The constitutional injuries flowed from at least two municipal customs:

57. **Warrantless Strip-Search Custom.** Despite *Tenenbaum v.* Williams, 193 F.3d 581 (2d Cir. 1999) and § 1034 FCA, ACS routinely orders bodily inspections without consent when a sibling dies. Multiple pending class actions (e.g., *Doe v.* City of New York, E.D.N.Y. 2024) describe identical conduct.

58. **Post-Clearance Pressure Custom.** ACS policy mandates Child-Safety Conferences even after cases are coded "unfounded," and field practice employs coercive tactics—late-night calls, multiple phone numbers, unannounced visits, family separation strategies, and persistence past engagement of counsel—to secure parental attendance. King's texts, call records, and voicemail evidence (Exs. E & F) show this custom in action, with at least three different phone numbers used to contact Plaintiffs and repeated calls to both parents separately continuing as recently as April 22, 2025.

59. These municipal customs were moving forces behind the constitutional violations. See *Monell v.* Dep't of Soc. Servs., 436 U.S. 658 (1978).

60. The City has not provided adequate training on constitutional limitations for strip searches, as evidenced by ACS personnel's complete disregard for Fourth Amendment constraints.

61. Defendants' repeated constitutional violations despite "no concerns" findings establish that the City has a custom of permitting constitutional violations in the child welfare context.

62. These violations occurred pursuant to ACS policies that:

   a.   Fail to require court orders for non-emergency bodily inspections

   b.   Encourage intrusive interventions even after safety concerns are ruled out

   c.   Do not adequately train workers in Fourth Amendment requirements

   d.   Permit administrative pressure tactics to compel compliance

   e.   Permit family division and separation during mandatory conferences

63. Given ACS's clearly documented positions in recent litigation, these customs, patterns and practices represent official policy despite formal lip service to contrary values in published policies.

## PRAYER FOR RELIEF

64. **Continuing-Violation Damages Theory and Quantifiable Harm.** Because ACS's late-night texts, multiple "burner" phone calls, and unannounced visits all occurred after ACS conceded it had "no concerns" and would close the case, each new contact re-triggered Plaintiffs' trauma, caused fresh emotional harm, and therefore compounds the compensatory damages recoverable at trial under the continuing-violation doctrine. See

*Tolbert v.* Queens Coll., 242 F.3d 58, 69 (2d Cir. 2001) (recognizing that a series of related acts can be treated as one continuous wrong for damages and limitations purposes). The Notice of Claim (Ex. D) appropriately values these damages at no less than $25,000,000 given the egregious nature of the constitutional violations, their timing during acute family grief, ACS's reckless disregard for established law and professional standards, and the foreseeable long-term psychological impact on a vulnerable three-year-old child and his bereaved parents.

**WHEREFORE**, Plaintiffs request judgment:

A. Awarding compensatory damages as determined at trial;

B. Awarding punitive damages against the individual defendants;

C. Declaring the warrantless search unconstitutional;

D. Enjoining ACS from conducting or facilitating strip searches of children absent parental consent, a court order, or a documented emergency;

E. Enjoining ACS, its officers, agents, and employees from initiating further contact with Plaintiffs or their minor child absent parental consent, a valid court order, or documented exigent circumstances;

F. Awarding attorneys' fees and costs pursuant to 42 U.S.C. § 1988;

G. Granting such other and further relief as the Court deems just and proper.

**EXHIBIT INDEX**

(Chronologically ordered; all personal identifiers have been redacted unless otherwise noted)

Exhibit A: Mr. Shannon's late-night text message (3/27/2025, 00:16 hours)

Exhibit B: Letter from Plaintiffs to ACS (3/31/2025)

Exhibit C: Phone call notes re: Ademola conversation (4/1/2025)

Exhibit D: Notice of Claim filed with NYC Comptroller and Notification to ACS (4/2/2025)

Exhibit E: Ms. King's phone and text records to Dr. and Ms. S.C. (4/7/2025-4/22/2025)

**Filing format (ECF):** All exhibits referenced in this Complaint (Exhibits A-F) are provided in the accompanying file titled 'SC_Exhibits_A_to_E.pdf', with each exhibit clearly labeled and separated therein. The table is included inside the Complaint for ease of reference, and each referenced exhibit is cited parenthetically at first mention (e.g., "(Ex. D)").

Dated: San Juan, Puerto Rico

April 23, 2025

/s/ Dr. S.C.

Dr. S.C.

Plaintiff Pro Se

/s/ Ms. S.C.

Ms. S.C.

Plaintiff Pro Se

Address: [Filed Under Seal]

Telephone: [Redacted]

Email: [Redacted]